Good afternoon, Your Honors. May it please the Court, John Casey on behalf of the Defendant Appellant Christopher Thompson. If it pleases the Court, I'd like to begin with the first part of my report, detailing to the Court specific instances of extraneous prejudicial information. The Court abused its discretion in denying the Defendant's motion for a new trial. To give a little background, Your Honor, there was a jury trial for Mr. Thompson, the Defendant, which regarding a first-degree murder, a shooting at a restaurant on August 3rd of 2013, and a jury trial was held on February 8th of 2016, which lasted all the way through February 18th of 2016. At that time, the jury returned a verdict of guilty. Shortly after that, on February 22nd, jury number four was talking about this case with her father, and he was telling her a lot of information about facts that had come out in the newspapers that he already knew. He started telling her these facts, and they started matching conversations that other jurors were having with her during deliberations. The very next day, on February 23rd, this juror wrote a letter detailing her concerns and detailing what had occurred between her and the other five jurors. She wrote this to the judge, but she carboned defense counsel and the state's attorney on this letter. Now, this letter, she wrote it because she expressed a great deal of concern about some of the comments that were being made, the first of which involved the first alternate, juror number seven. At some point, juror number seven was the first alternate. There was a he made sure that the other jurors on the panel were out of the building, so they would not know what had happened. The next day, juror number seven comes in and talks to the whole jury and the alternates, saying that she was going to be on the jury now. People were asking her, how do you know that? Juror number four said she didn't hear what she said the first time. Then later, she asked her that, wondering how she would know this. She put her finger up to her mouth and said, quietly, the paper. I'm assuming the newspaper, but in the letter, she says the paper. The juror goes on. She says she didn't think anything of that at the moment, but then she later went on, and when they were in deliberations, there was some concern about a videotape where Mr. Thompson, the defendant, had been talking to the police, and she had expressed to the other jurors that she didn't understand why someone who didn't know about the police, why he would act the way he did in this video. Juror number seven and juror number five very definitively told her he had been arrested before. Other comments that she details in the letter were a comment by juror number three that she thought all these guys are on drugs. The other jurors told her that he had been arrested before, and this was of great concern to her, and in the letter, she had explained that she thought it affected her decision. So after receiving the letter, the court mistake did not do anything about this. The letter eventually came to a defense counsel. The defense counsel raised it in a second motion for new trial or in the alternative, a request for an evidentiary hearing, and that was denied. In the trial court's ruling, basically I think had an incorrect interpretation of 606B with the court, and there were two issues there. One with issue number one is was there improper extraneous influence exerted on the jury per 606B1, and the second one was an issue that has been recently decided by Pena-Rodriguez versus Colorado about can you impeach a jury about racial bias. The judge didn't believe, at the time he was correct, the law was that you couldn't impeach a juror on anything, including racial bias, but I think he was incorrect in when he believed that 606B precluded him from delving further into this letter from the juror, although the court did make some rulings or findings on the letter. And so, we believe that the court abused its discretion in flat out refusing, one, denying a new trial, two, refusing to even do any investigation or conducting an evidentiary hearing regarding this issue. Now, the issues when you're dealing with extraneous influences, one, the parties sharing the verdict need only show that the information relates directly to something at issue in the case which the losing party did not have the opportunity to refute. Second, and it may have influenced the verdict. Now, there's no need for the losing party to prove actual prejudice, and if they satisfy those two elements, at that moment the burden should shift to the state to demonstrate that this prejudice was harmless. And you are to presume that if there's contact, extraneous improper contact with the juror from outside influences, that that is presumed to be prejudicial. And going through the letter we can look to see exactly, you know, the first issue, does it relate, directly relate to an issue in the case? Well, in her letter she talks about, they were adjourned deliberations, one of the issues was his sophistication with the legal system. That is exactly when Juror 7 and Juror 5 brought this information in. And attached to her letter, she included two articles in the Herald News, and one of them, it talks, it starts getting fast, and at the very last two sentences, the last two sentences, last paragraph, the article mentions that the jury was adjourned. So, you know, it would be, it would strain Judge Julie to say that she just happened to be reading that one article, and only look at the bottom last two sentences. She would have had to have read down there. Another article she attached, which we presume would be similar to some of the conversations the jurors were having, detailed a lot of information that wouldn't have been available to the jury, that had been precluded from motions in limine. It certainly was an issue in the case. They're talking, they talk about the defendant's criminal background. The article that includes Juror Number 2 being, you know, dismissed, went into detail about a informant, Arsenio Picci. So, you know, his, you know, one of the articles she attached had talked about his carjacking, his involvement with a gun. So she, and it's important to know that this is not your typical case involving outside extraneous influence. Usually, it's a defense attorney going out and seeking information and getting affidavits and bringing it in. Here's a case where the, the juror herself did the work, and she went, she bypassed counsel and went straight to the court, and the court didn't do anything. And I would argue that I think the court should respond, they should do their own investigation. Otherwise, I think it violates due process. You know, the state makes an argument in their brief that there was no affidavit, and I would argue that this is not, it's irrelevant. First, you know, I think an unsolicited letter from the juror is probably more credible than, than the attorney going out and doing his or her own investigation. Secondly, the law doesn't require it. You know, and I would point to, there's two cases from the third district that I think are very helpful here. One is the Wilmer case, and the other one is Thornton v. Garcini. Now, Thornton v. Garcini is not a criminal case. It's a medical malpractice case. And there's no, there's no hearing in that case, and there is no affidavit. What happens is the jurors, you know, Thornton files a post-trial motion, the jurors come forward saying they've been exposed to, you know, exposed to prejudicial, extrinsic information. That's getting a motion for a new trial. The judge decides to send out a juror questionnaire. And the issue in that case isn't as dire. I mean, the articles we're talking about here are specifically about the defendant, are about the testimony in the trial, and background of the defendant that were kept out because they were too prejudicial. In Garcini, Thornton v. Garcini, they're dealing with articles about the, the case, the medical malpractice case where a baby had died. And they talk about their general articles about infant mortality and things like that. And two of the jurors in Garcini said, yes, we brought them, but we don't know if they were discussed in the court. And Garcini said, we can't assume that the other jurors didn't hear about this, even though only two said that they had been exposed or read the articles. You know, the court in Garcini suggested that, you know, you have to, you can't just take a juror's word for it that they haven't done this research. And in Garcini, they granted a new trial. And that's what we're asking for here. And I would point, the two cases that talk, that actually, in a similar situation that granted new trials, one was Garcini, the other one was Holmes. That's the Illinois Supreme Court case from 1978. Now there, that was the Floresheim case where the jurors did their own investigation. And one of the things, and they don't actually talk about what the investigation led to in, in Holmes, but the Illinois Supreme Court says, we question what more proof could have been induced. And we would argue that what else could be induced here? She laid it all out. You know, the only, I guess the only issue would be a spew. It's not a signed affidavit. But nobody in the motion for your trial hearing raised a doubt about the credibility of the letter. I get, that would have been a good reason for a hearing to make sure if you believe it. Although there's been no, nobody expressed the doubt that it was authentic. So if it's authentic, what else could be induced here? Now the difference between, it would be consistent with Wilmer, because in Wilmer, you had a husband, husband went home and asked his wife to research the law defining the crime. And when he went back, he gave that definition to the other jurors. At the same time, the other jurors took reading Bible verses. Now the court in Wilmer said, we don't know, it very well could have been the actual law. It could have been accurate. We don't know if there was any sort of, if it was prejudice. We don't know the nature. You know, Bible verses are rarely prejudicial. So they were mandated for another hearing. At the very least, that should happen here. But here, she's detailing specific outside extrinsic influence. And, you know, moving into the second. Before you leave this issue, I have a question. Sure. You've mentioned motions in limine a couple of times. Yes. Was there a specific motion in limine to exclude the criminal history of the defendant? There were motions in limine. There was a videotape. And there were segments that were kept out. Yes, there was. And the motions in limine were numbered, I believe, one through eight. And there was a, I believe his, he didn't testify, but I know the issue about being shot was in the videotape and that was excluded. And the, one of the convictions was, I believe, too remote time to come in. So yes, it was addressed. I think there was some of his criminal history that would have come in had he testified. And he did not testify. The carjacking was subject to motion in limine, I believe, and that was kept out. So a lot  Now, I would also argue, then, you know, the case, the case is talking about if you're exposed to the outside articles. And every jury in Illinois, every jury is told not to do their own investigation. They're told not to read newspaper articles or media reports. And, you know, another reason for the trial is, you know, when the state argues that the defense should have gotten an affidavit, that's assuming that the juror wanted to talk to defense counsel. Once again, the trial courts, the trial courts, they admonish the jurors that they can talk to people if they want, but they do not have to. So this juror bypassed And I think, you know, just assuming that this is always supposed to be the duty of the defendant or defense counsel, you know, to have an impartial jury to avoid improper external influence, you know, that's what we should all strive for. The court should want that. The state should want that. You know, and racial bias. I think to put the onus on the defense counsel would be against what we want for justice in the criminal system. Your Honor, for these reasons, we are specifically asking on Issue 2 that we have a new trial or an alternative hearing. As to Issue 3 and 4, we're also asking for a new trial. And we would stand on our brief on those issues. As to Issue 2 regarding racial bias, we mentioned, sorry, at the motion for new trial, that that statement, all these guys, and later on in the letter where she says, I don't understand how people could look at someone and know what their lifestyle is like, that we admit that those under, you know, they don't completely show us what, you know, the racial bias is, but they clearly indicate some sort of racial bias. And I would argue that you don't have to use the actual words or racial epithets to say that it's overt racism. And the court in Pena v. Rodriguez did not set up, they did not set a standard. They, in fact, said this case does not ask and the court need not address what procedures a trial court must follow with a motion, and the court also did not set an appropriate standard for determining this. And in Pena, they did, they, under the court's direction, they asked for the affidavit. So, you know, I believe this court could remand it on the racial issue, you know, for a hearing or for the court to at least do some background research to see what these sort of racial, what the racial bias might be. And keeping racial bias out of the jury system, as Justice you're right to an impartial jury. The Sixth Amendment right to an impartial jury. So, for those reasons, Your Honor, we would ask the relief I just mentioned. Thank you. Counsel, you'll have time to reply. Five minutes. Counsel, you may respond. May it please the court. Counsel, let me begin with the Wilmer and Thornton cases. In those cases, those cases are factually distinguishable from the case here. And there, there was concrete evidence that the jury was exposed to outside sources. In this case, let me begin with the general rule, is that the jury may not be impeached by the testimony or affidavit of the jurors. And in this case, we have no concrete evidence. The trial judge was not confused about Rule 606B. He dismissed the juror's letter and the motion because he believed it was based on speculation and conjecture. And in fact, it was. Let me begin with the, what the juror number four said in her letter. The first allegation was juror number seven stated that she knew that juror number two was not coming back and she learned that from the newspaper. Well, the defendant must establish by showing that the information related directly to something at issue in the case and that it may have influenced the verdict. Well, that does not go to why the verdict was incorrect in this case because all it does is go to why the juror knew that juror number two was not coming back. It doesn't address the verdict. But doesn't that article where they have a discussion about juror number two not coming back, doesn't that article contain a lot of other information about some items that were subjects of the motion of limine and some other items about the defendant then? Well, all of the information that juror number four states in her letter is speculation that she discovered after the trial. We can't assume that the juror read the whole article. The juror four just stated that juror number seven stated that she learned that it was not, he was not coming back because she knew it from the newspaper. We don't know what she learned from the newspaper other than that. I don't think you should assume that juror number seven read the newspaper per se because it's simply her speculation that these jurors must have had outside information. Juror number seven's only admission here was that she learned that juror number two was not coming back. She never said that she learned that there were other facts in the article or that she had read the article. All she knew was that she knew it from the newspaper. This is whether she read it in the newspaper or perhaps somebody told her it was in the newspaper. We have no concrete evidence in this case that any outside articles or influence were given to the juror. How would we find out after the case? Right now we've got an inference and maybe perhaps it could be concluded to be a reasonable inference, but how would we go about finding out? Right, well the first thing the defendant has to prove is that some outside influence was given to the jury and that it may have influenced their verdict. Here I argue that the defendant failed to meet that verdict. The only way, of course, to find out whether there was any outside influence would probably be by an affidavit from the jurors or the trial judge could have ordered a hearing, but we don't even get to that step because we don't have the defendant here meeting his verdict. This letter is merely speculation and conjecture on juror number four's part. There's no concrete evidence. Well, Mr. Leonard, there is concrete evidence that there was information that was given to the jury during its deliberations that had been specifically excluded by the court. We don't have that. All we have is juror number four's statements that she believed that they must have had outside information based on what she perceived in the jury deliberations. I thought that she said in her letter that jurors number five and seven reported to all of the jurors that the defendant had been previously arrested. Yes. Is that information that the court excluded? That is information that the court excluded, but it doesn't say how those jurors knew that maybe he was arrested before. It doesn't say that they read outside articles. It only says that she suspected that they read outside articles. We have no concrete evidence that these jurors actually were exposed to outside articles and that these outside articles may have influenced their verdict. All we have are juror number four's speculation about the other jurors, and I argue that that is not enough information to meet the initial burden to have a hearing on whether the jurors did receive information from outside articles. But we do know that they received information. No, we don't. We know that all of the jurors received information from jurors five and seven that the court had said should not be available to them. Well, we don't know if they knew that or whether they said they suspected that we were inside the jury room. Juror number four does not elaborate on how the jurors knew that. She surmises, speculates that the jurors must have known that because they had read outside articles which she read after the jury trial was over. So we really don't have any evidence that they received any outside extraneous information besides the speculation by this juror, and I submit that that's not enough evidence for an evidentiary hearing in this case. Well, I mean, the judge in Thornton case sent out a questionnaire and asked questions of the jurors about the information that had come out of that trial. I mean, what is the threshold level? I don't think there was any more concrete evidence of extraneous influence in that case. I mean, you know, one juror said there was some articles, but whether or not anyone else relied on them or whether they read them, I mean, without getting some evidence at a hearing, how else are they going to substantiate this? Well, there was evidence in the Thornton case that the jury was exposed to. There was some concrete evidence showing that they were exposed to some extraneous evidence. As to this case, the defendant has to meet the initial burden. I don't believe the defendant has met the initial burden by Juror 4's letter. I believe the trial judge was correct here when he ruled that this was merely speculation and conjecture on the part of Juror 4, even though the Juror 4 believed this doesn't make this true. I don't believe the defendant met his burden. I don't believe that the trial judge had to hold an evidentiary hearing. It would have been invitations for defense counsel to obtain an affidavit. I disagree and believe that an affidavit would be necessary in this case. I believe an affidavit is more strong evidence of some kind of outside influence on the jury rather than a mere letter penned by a juror who has suspicion about other jurors. It's kind of like hearsay twice removed. Let me address the last issue in Juror 4's letter. These guys are probably high on drugs. While there is no evidence of drug abuse, but that could be just Juror 3's speculation while maybe these people are high on drugs. How do you explain a defendant going into a crowded restaurant and shooting another person at point-blank range? We don't know if this juror had any outside extraneous information to make that statement. It doesn't say that he had outside information or he looked at outside information. Again, we just have the speculation of Juror 4. Finally, Juror 4 states that after reading the articles, although I cannot say 100%, I feel as though the other jurors had outside information that influenced their decision. Juror 4 even states in her letter that she has doubts about her own letter. She just has speculation that these jurors must have had or may have, and she's not even 100% sure. I submit that that does not meet the level of the burden that the defendant has to prove in this case. If we wanted to have an outside investigation, I believe defense counsel should have found an affidavit from Juror 4 or followed up on these leads. We hold the sanctity of the jury deliberations sacred, and we cannot go into their motives, methods, or processes. The defendant can only show whether the jurors were exposed to extraneous information. Here, there's no concrete evidence besides Juror 4's speculation that the other jurors may have relied on other outside information. With regard to the second issue, whether there was racial bias by the jurors, I will cite to where it says in the letter. The two statements from Juror 4's letter, these guys are probably high on drugs, and the other statement, she felt very naive that people can just look at someone and know what type of lifestyle they have. Well, neither one of those statements referred to race. Drug abuse occurs across races, genders, and levels of income. You just can't assume just because they use drugs that there was some racial bias. Neither can you from the second statement. The U.S. Supreme Court's decision in Kenya Rodriguez makes it clear that a juror must make a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant. Here, we don't have any clear statement on race. I don't see how you can get race out of these two statements. No, you can't even get quote. She says, these guys. That is gender. The trial judge, I believe, had a kind of a sidetrack or side discussion saying that every time he goes into a restaurant with his wife, the waitress will come up and say, what do you guys want for dinner? And he said he cringed every time he heard that. So in the common colloquial language nowadays, when you say, you guys, it could refer to women or men. You don't have anything more than inference in either direction, right? Right. So I don't see how those two statements, that you can find that there was any racial bias by the jury. And it doesn't meet the test in Pena-Rodriguez. I believe I addressed all the other issues in my brief. I'd ask that you affirm the defendant's convictions and sentence. Thank you, counsel. Counsel, you may reply. Thank you, Your Honor. To address the affidavit issue first, the Thornton case, if I'm correct, I think the jurors don't say that they discussed the articles with the other jurors. And the other jurors don't say that they had heard any of this information from these articles. And they said, that's okay. We can't just assume the jurors are being honest about that, about violating the instructions of the court. And actually, once again, I point out the fact that the state is arguing that the defense had some sort of affirmative duty to get this affidavit. And the only power that they would have would be to ask for it. The court could call them. And the court has a lot more power than defense counsel does. And if that's the rule, that puts the defense at a disadvantage. If they're running into jurors that just don't want to talk to them. And a lot of the cases dealing with this talk about avoiding defensive counsels going out and harassing jurors. And this is a case where the juror, a couple days later, took it upon herself to come forward. She didn't want to go to defense counsel. She copied the state and defense counsel. She was going to write to the judge looking for some sort of instruction. I don't think, as far as specificity, it's not speculation. She gave specifics. She told the court that they said this. They said he had been arrested. And she used qualifying language when she talked about those guys. She said probably. But juror five and seven, they say in her letter, he had been arrested before. That's very definitive. And I would sort of tie the two together. Pena v. Rodriguez, the court, Justice Kennedy went out of his way to point out the fact that in that case, the jurors came forward. It wasn't the defense counsel. So the Supreme Court put some weight on a juror coming forward themselves. And I think that's important. And I would ask the question, if they didn't get this information from the newspapers, why were they coming to this conclusion? You know, there was nothing submitted to them during the trial that he had been arrested. There was nothing about drugs. And actually, the facts of the shooting wouldn't suggest drug use. It was an argument. There were two instances. There was an argument between Mr. Thompson, which he admitted he was there with Mr. Franchini, and then it varied between 15 minutes and a half an hour later, someone with their face partially covered, depending on which witness, did the shooting. And now that was assumed that it was him based on the fact he had been in the restaurant before. There was nothing in there to suggest that he was high on drugs or anything of that sort, that it was more of a the motive the State was insinuating was anger and revenge. And as far as Pena v. Rodriguez, I said this before and I'll point it out, the Court went out of its way to say we are not deciding the appropriate standard for determining when evidence of racial bias is sufficient. And they don't talk about the procedure. So, you know, basically Pena Rodriguez wipes the slate clean and says, we're just saying right now that racial bias, we have to keep this out of the jury room. It's too important. And this is our beginning. And we don't know yet. And if you think about it, the first thing that happened in Pena Rodriguez was two jurors approached defense counsel and said there were general anti-Hispanic comments. That was brought to the Court. The Court then under its supervision went out and sought the affidavits that then brought out the very specific, very, you know, racist, anti-Hispanic males that they just take what they want statements. So the first indication that we have of some sort of racial bias is just a general, you know, this juror, H.C., was he was anti-Hispanic. And then the Court took it upon themselves. And defense in the motion for new trial, we agree that this is not alone what should warrant the new hearing, or sorry, new trial, but it does warrant some investigation. And taking context, these guys, and I think the trial court's description of that statement is being like he and his wife out to dinner and like, what do you guys want? That's not a fair comparison. You know, he is saying, you know, he's saying they're probably all high on drugs. And then she, you know, puts it in context saying how can someone look at somebody and know what their lifestyle is? That, you know, this letter written a day after she talked to her parents and got concerned, deserves to be looked into, even the racial issues. You know, that can't just be dismissed. As I request, Your Honor, we're requesting a new trial as to Issues 1, 3, and 4. We stand on our brief as to Issues 3 and 4. And we would ask that the Court would remand with instructions on Issue 2. Thank you. Thank you, Counsel, for your arguments in this matter this afternoon. We'll be taking any advisement that this position shall issue. The Court will stand in brief recess for panel discussion.